John J. WALKER, Plaintiff, Appellee,

v.

WALTHAM HOUSING AUTHORITY and
Edward McCarthy, Defendants,
Appellants.

John J. WALKER, Plaintiff, Appellant,

v.

WALTHAM HOUSING AUTHORITY and
Edward McCarthy, Defendants,
Appellees.

Nos. 94–1238, 94–1239.

United States Court of Appeals,
First Circuit.

Heard Sept. 9, 1994.

Decided Jan. 17, 1995.

Paul E. Stanzler with whom Elizabeth J. Maillett and Burns & Levinson, Boston, MA, were on briefs, for defendants.

Philip R. Olenick with whom Paul L. Nevins, Boston, MA, was on briefs, for plaintiff.

Before BOUDIN, Circuit Judge, ALDRICH, Senior Circuit Judge, and YOUNG,* District Judge.

BOUDIN, Circuit Judge.

The appellant Waltham Housing Authority ("WHA") is a public agency responsible for providing low income housing in Waltham, Massachusetts. In 1987, appellee John J. Walker had served as the WHA's executive director for over eleven years and was currently serving in this position under a two-year written contract due to expire on December 31, 1988. The WHA Board of Commissioners consisted of five members, including Chairman Louis D'Angio and appellant Edward McCarthy.

In the summer of 1987, the Board began a personnel search to replace the WHA's retiring assistant executive director. At a board meeting on August 12, Walker expressed his dissatisfaction with the three finalists whom the Board was considering. The Board nevertheless selected one of the remaining candidates, Walter McGuire, to fill the position.

Believing that his contract gave him the final say on hiring, and angered by the Board's action in selecting McGuire over his objection, Walker presented Chairmen D'Angio with a hastily scribbled letter of resignation and then left the meeting. The letter read:

Mr. Louis D'Angio Chairman Waltham Housing Authority, I hereby resign effective 6:50 p.m. Aug. 12, 1987 and will file for retirement Aug. 13, 1987.

/s/ John J. Walker

D'Angio passed the letter around to the other Board members, and the Board voted unanimously to table Walker's resignation for further consideration.

Following the meeting D'Angio, at the urging of Board members, went to Walker's office to talk him out of resigning. D'Angio returned the resignation letter to Walker, placing it on his desk and telling him that the Board wanted him to take it back. Walker said nothing but (he later testified) put the letter in his shirt pocket, believing that his resignation had been rejected. The next day Walker came into the office and did not file papers applying for retirement.

The Board scheduled a special meeting for August 17 to address the matter of Walker's resignation, which was still tabled. Three days before the meeting Walker told D'Angio that he wanted three matters "handled" or "cleared up": a modification of the assistant executive director's job description; a $2,000 salary adjustment for Dorothy Boyle, who was an assistant WHA administrator and Walker's sister-in-law; and Board agreement to Walker's "strong input" into selections for assistant executive director and two other positions. D'Angio asked Walker not to attend the August 17 Board meeting but to let D'Angio present his position.

D'Angio did not tell the Board that he had given Walker his resignation letter back. Instead, at the August 17 meeting D'Angio declared that Walker would rescind his resignation only if the Board agreed to meet three conditions. The three conditions, presented as nonnegotiable demands by D'Angio, were the same three matters that Walker had told D'Angio at their August 14 meeting that he wanted "cleared up." The Board had no objection to the first two conditions, but balked at the third request—Walker's "strong input" into the Board's selection of the top staff positions.

Two members of the Board, McCarthy and Joseph Pavone, were concerned that Walker wanted the final say on hiring for those positions; they asked if Walker would come before the Board to discuss his position on this matter. D'Angio said that the three conditions were a "take it or leave it" proposition and that Walker would not appear to discuss them. On McCarthy's motion, the Board then voted to accept Walker's resignation. D'Angio joined in the unanimous vote

---

* Of the District of Massachusetts, sitting by designation.

but then resigned as chairman, and McCarthy was elected to complete D'Angio's term.

Afterwards, D'Angio discussed with Alfred Bergin, another Board member, the possibility of calling a special meeting to "straighten the whole matter out." The WHA's bylaws required the chairman to schedule a special meeting of the Board upon the request of two members. D'Angio believed that there were at least three Board members—Bergin, Pavone and himself—that could be counted on to vote for Walker's reinstatement at a special meeting.

By letter dated September 3, D'Angio and Bergin requested that McCarthy schedule a special meeting for September 21 to discuss Walker's resignation. The proposed date was significant because it was just before Bergin's term on the Board was slated to expire on October 1. The letter recommended that Walker be invited to address the Board. On September 9, Walker himself sent a letter to the Board asking for an opportunity to speak to them about "a few misunderstandings" concerning his resignation.

McCarthy told a subordinate to ask an attorney whether McCarthy had authority to defer the Board meeting, and the attorney said that McCarthy had authority to select the date himself although the meeting should be held at the earliest time convenient for all members. After getting this legal advice, McCarthy put off the requested meeting until October 7, six days after Bergin's departure from the Board. Apparently, the attorney had no information about Bergin's expected departure between the two dates.

McCarthy later testified that he had postponed the meeting because of conflicts with his own heavy work schedule in September, but also because he wanted Bergin's replacement, Henry Walsh, to consider the issue of Walker's resignation; Walsh, said McCarthy, would be living with the outcome of the controversy during his term on the Board. McCarthy spoke with Walsh about the issue of Walker's resignation before the special meeting, and Walsh told McCarthy that he wanted nothing to do with that "mess."

Walker appeared before the Board on October 7, and raised the same three matters that D'Angio had set forth at the August 17 meeting. After hearing from Walker, who requested his job back, the Board voted on whether to waive its earlier acceptance of his resignation and to reinstate him as executive director. Two members—D'Angio and Pavone—voted for Walker's reinstatement, and one member voted against it. Henry Walsh, Bergin's replacement on the Board, abstained. Apparently breaking with Board tradition, McCarthy as chairman then cast a no vote to create a tie, which defeated the motion.

Walker filed suit against the WHA and McCarthy on December 23, 1987, claiming that he had rescinded his resignation prior to the Board's August 17 meeting, thereby preventing the WHA from accepting it. As later amended, the complaint set forth six counts:

- Count I, brought under 42 U.S.C. § 1983, alleged that the WHA and McCarthy violated Walker's due process rights by terminating him without a prior hearing;
- Counts II and III alleged that the WHA breached Walker's employment contract and its own personnel policies;
- Count IV alleged that McCarthy tortiously interfered with Walker's employment;
- Count V alleged that McCarthy violated the Massachusetts Civil Rights Act, Mass.Gen.L. ch. 12; and
- Count VI sought a declaratory judgment that, as a result of the preceding conduct, Walker's dismissal by the WHA was improper.

Walker requested compensatory and punitive damages, reinstatement, back pay, attorney's fees and various other forms of equitable relief.

On count I, Walker's section 1983 claim, the district court granted summary judgment for McCarthy and for the WHA "with respect to liability for monetary damages." The court found that McCarthy was immune from section 1983 liability because, given D'Angio's statements to the Board, McCar-

thy was entitled to vote to accept what he believed to be Walker's still outstanding resignation letter. As for the WHA, the court ruled that D'Angio's alleged misrepresentations to the Board on August 17 did not make the WHA liable for damages, since D'Angio lacked final policymaking authority to act for the WHA to alter Walker's employment status.

Nevertheless, the district court ruled that Walker *might* still be able to obtain equitable relief under count I in the form of reinstatement as the WHA's executive director. Framing this issue for trial, the district judge wrote:

> [A]t least in the factual context of this case, if Walker can convince the jury that he had unconditionally rescinded his resignation prior to the August 17 Board meeting and that D'Angio misrepresented that fact to the Board, then plaintiff may be entitled to reinstatement as Executive Director.

Thereafter, the district court granted summary judgment in favor of McCarthy and the WHA, on counts II (breach of contract), III (breach of personnel policies) and V (state civil rights claim). On count VI (the declaratory judgment claim) the court dismissed "[t]hose portions ... having to do with the counts that have been disposed of on summary judgment...." The court denied summary judgment for McCarthy on count IV (Walker's tortious interference with employment claim) ruling that McCarthy enjoyed no immunity from intentional torts under Massachusetts law and that Walker had raised a triable issue of fact as to McCarthy's motivations in scheduling the October 7 special meeting and voting at that meeting to create a tie.

This left for trial count I, limited to equitable relief against WHA, count IV (the tortious interference claim against McCarthy) and possible declaratory judgment. After conferring with the parties, the district judge entered a pretrial order. The parties agreed that the case would be tried, with a jury, before a magistrate judge. They also agreed that "the only issues to be tried," as framed by the order, were:

(a) Whether Louis D'Angio misrepresented to the Board of the Waltham Housing Authority plaintiff's alleged revocation of his resignation and, if so,

(b) Whether Edward McCarthy tortiously interfered with plaintiff's employment as the Authority's executive director?

(c) The amount of damages. Plaintiff claims for back pay at least to December 31, 1988, medical insurance, life insurance, pension benefits, and the use of an automobile. The parties agreed to stipulate the amounts of the separate elements of damages.

The parties also agreed to bifurcate the trial with issue (a) to be tried first ("phase I"), to be followed by the trial of issues (b) and (c) ("phase II"), if necessary, to the same jury immediately after the verdict on issue (a).

Thereafter, the defendants moved to strike Walker's jury trial demand on phase I, arguing that count I was now limited to an equitable remedy triable to the court. The magistrate judge denied the motion, noting that phase I of the trial encompassed a factual determination—whether Walker had withdrawn his resignation—that was common to both Walker's equitable claim under count I and his legal claim under count IV. The court said this issue should therefore be tried to the jury, but the court would ultimately decide whether equitable relief was warranted.

■ Trial on phase I then proceeded. The trial evidence has already been summarized above in the light most favorable to the verdict. *Hendricks & Assoc., Inc. v. Daewoo Corp.*, 923 F.2d 209, 214 (1st Cir.1991). On November 19, 1992, the jury answered affirmatively each of the three questions submitted to it on issue (a):

1. Do you find from a preponderance of the evidence that plaintiff John Walker has proven that he rescinded or revoked his written resignation prior to the August 17, 1987, board meeting?

2. Do you find from a preponderance of the evidence that plaintiff John Walker has proven that the rescission or revocation of his resignation was unconditional?

3. Do you find from a preponderance of the evidence that plaintiff has proven that Mr. D'Angio misrepresented to the board on August 17, 1987, the fact that plaintiff had unconditionally rescinded or revoked his resignation?

The next day trial proceeded to phase II, to address issues (b) and (c) outlined in the pretrial order. On November 30, the jury found that McCarthy had tortiously interfered with Walker's employment at the WHA and awarded him $79,018.78 in damages. The jury also answered affirmatively the following five questions in phase II:

1. Do you find from a preponderance of the evidence that plaintiff had an employment relationship with the Waltham Housing Authority?

2. Do you find from a preponderance of the evidence that plaintiff has proven that defendant McCarthy knew about this relationship?

3. Do you find from a preponderance of the evidence that plaintiff has proven that defendant McCarthy's interference, in addition to being intentional, was malicious?

4. Do you find from a preponderance of the evidence that plaintiff has proven that his loss of employment relationship directly resulted from defendant McCarthy's conduct?

5. Do you find from a preponderance of the evidence that defendant McCarthy was motivated by actual malice, amounting to malevolence, spite or ill will?

On April 5, 1993, the magistrate judge entered an order denying Walker reinstatement under count I on the ground that the equities weighed against reinstatement. The magistrate judge initially ordered back pay as equitable relief and declared that Walker's termination was improper but on reconsideration vacated both awards—the former on the ground that it was foreclosed by the district court's pretrial rulings, and the latter on the ground that the WHA had acted in good faith so that the termination could not be described as improper.

Final judgment was entered on August 26, 1993, in favor of the WHA and McCarthy on all claims except count IV. On count IV judgment was entered for Walker against McCarthy in the amount of $79,018.78. The court denied Walker's request for attorney's fees under 42 U.S.C. § 1988, finding that he was not a prevailing party under that section. Both sides have appealed to this court.

■ 1. We first address Walker's challenge to the district court's rulings that on count I McCarthy was entitled to qualified immunity under section 1983 and that under that section the WHA was not municipally liable for damages for either McCarthy's or D'Angio's conduct. We review these summary judgment determinations *de novo, Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 581 (1st Cir.1994), but find no error.

■ In dismissing the damage claims under count I, the district court held that on the undisputed facts Walker had submitted his resignation to the Board and thereafter had given the Board no reason to think that the resignation had been withdrawn. We agree that when McCarthy voted on August 17 to accept the resignation, he had no reason to think that the Board was firing Walker or infringing upon any due process right that Walker might have to a prior hearing before being involuntarily dismissed. *Feliciano–Angulo v. Rivera–Cruz*, 858 F.2d 40, 42–44 (1st Cir.1988). Accordingly, McCarthy had qualified immunity for his August 17 actions. *Harlow v. Fitzgerald*, 457 U.S. 800, 815–19, 102 S.Ct. 2727, 2736–39, 73 L.Ed.2d 396 (1982).

■ Perhaps a municipality might in rare cases be liable for a constitutional violation, even though the individual who acted for it was protected by qualified immunity. *See Owen v. City of Independence*, 445 U.S. 622, 647, 100 S.Ct. 1398, 1413, 63 L.Ed.2d 673 (1980). But—ignoring the other requisites for municipal liability, *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)—in this case it is difficult to see how there could be a constitutional violation at all since a majority of the Board reasonably thought that they had a voluntary resignation before them. *See Stone v. University of Maryland Medical System*, 855 F.2d 167, 172–75 (4th Cir.1988).

Walker says that McCarthy *later* acted in bad faith when in October he blocked Walker's reinstatement. But nothing McCarthy did after August 17 casts any doubt on his belief in August that Walker's previously tendered resignation was outstanding at that time. (Indeed, there is no evidence that McCarthy acted in bad faith in October.) Walker's alternative suggestion on appeal that the WHA might be liable for D'Angio's misrepresentations is made in so cursory a fashion that we regard it as waived. *Ryan v. Royal Ins. Co.,* 916 F.2d 731, 734 (1st Cir.1990).

Walker next claims that the magistrate judge should have ordered his reinstatement after the jury found that D'Angio had misrepresented the status of Walker's resignation to the Board. The Board responds that section 1983 is a fault based statute and, since the Board was not at fault in accepting the apparently outstanding resignation, the court had no power to reinstate Walker. We need not resolve the legal question whether there could be equitable relief without fault, since the magistrate judge was unquestionably within her authority in holding that the equities did not warrant such relief.

At the time that court-ordered reinstatement became an arguable option in late 1992, Walker's two-year contract had long since expired. Further, Walker himself caused much of the confusion, not merely by his impetuous resignation letter but by failing forthrightly to withdraw his resignation thereafter, choosing instead to sponsor new demands as an apparent condition of continuing as executive director. The magistrate judge soundly exercised her discretion in finding that Walker had no equitable claim to post-contract reinstatement.

2. We come now to the difficult part of the appeal, which is McCarthy's challenge to the verdict against him on count IV. McCarthy's best argument is that the evidence simply was not sufficient to permit a reasonable jury to find that McCarthy tortiously interfered with Walker's employment. The claim was rejected by the magistrate judge, who stressed that the jury is entitled to great latitude in factfinding. We agree with the principle but cannot, in this instance, agree that a rational jury could find that McCarthy engaged in tortious interference.

McCarthy's first argument is that the Board lawfully accepted Walker's resignation on August 17 and thereafter, when McCarthy took his challenged actions before and at the special meeting on October 7, no employment contract existed with which he could interfere. We have a different reason for thinking that McCarthy could not be liable for tortiously interfering with an *existing* contract. Whatever the status of Walker's resignation, McCarthy *reasonably believed* that the resignation was outstanding on August 17 and that it had been accepted, thus terminating the contract.

Under Massachusetts law, one cannot tortiously interfere with a contract that one reasonably believes is not in existence. *See Yiakas v. Savoy,* 26 Mass.App.Ct. 310, 526 N.E.2d 1305, 1309, *review denied,* 403 Mass. 1103, 529 N.E.2d 1346 (1988) (actor must have knowledge of contract and must know that he is interfering with its performance). Accordingly, it does not matter whether the Board's acceptance of the resignation was based on a misunderstanding or even whether (in some Platonic sense) the employment contract endured thereafter. McCarthy cannot be liable for tortious interference with contract rights that he had every reason to believe Walker had himself abandoned.

The question whether the resignation was rejected by the return of the letter might be of some importance if Walker were appealing on his original contract claim, but he has chosen not to do so. Even then it would be hard to resist the conclusion that if the resignation was rejected by the return of the letter, it was effectively renewed by allowing D'Angio to assert nonnegotiable conditions for Walker's return. It is even easier to conclude that McCarthy had no reason to believe that the resignation had been withdrawn, and that is sufficient to protect his vote to accept it.

█ Walker, however, has a second string to his bow. In his complaint, count IV focused on McCarthy's actions "in preventing the Board ... from rescinding" the prior asserted termination of Walker. Under Massachusetts law, this kind of interference with prospective employment relations is, like interference with existing employment, tortious if done out of actual malice or through improper means.[1] The magistrate judge so instructed the jury. There is no showing that McCarthy's means were unlawful or intrinsically unethical, so the question to be answered is whether a reasonable jury could find that McCarthy acted with actual malice.

The case for malice is extraordinarily thin. McCarthy testified that he postponed the special meeting because it was a busy period in his own regular job and because he thought that it was right for Walsh as a new Board member to consider a matter that would affect his own period in office. Neither explanation was directly impeached; and whether the latter reason is deemed good or bad, it is certainly a view that could be entertained without malice. There is also no evidence that McCarthy's discussions with the new Board member were improper or dishonest.

█ Nor do we think weight can be placed on McCarthy's failure to tell the lawyer about the prospective change in membership. McCarthy was assertedly concerned that he might be under a legal obligation to call the meeting on the night designated in the request for the special meeting and asked someone else to check with the lawyer. There is no evidence that McCarthy thought that the change in Board membership was pertinent to this legal question and deliberately had this information withheld from the lawyer.

Finally, McCarthy's casting of the tie vote, allegedly against tradition for the WHA chairman, proves nothing about malice. There is no claim that McCarthy broke any law or rule. Based on Walker's behavior—

the impromptu resignation, the failure to come to the August 17 meeting, the apparently nonnegotiable demands—there was ample reason for McCarthy to think that it would be in the best interest of the WHA if someone else were to assume the role of executive director.

At trial Walker offered evidence that he had complained to McCarthy that the latter's brother-in-law, also an employee of the WHA, had been performing insufficient work, and that McCarthy disagreed. Nothing in the fairly tame evidence about this episode suggested that McCarthy had become angry, threatened Walker, vowed revenge, or done anything else that would suggest that he harbored a continuing desire to harm Walker.

What we have is a perfectly plausible story from McCarthy, uncontradicted in either substance or detail, that is consistent in every respect with permissible motives. The jury might have thought it unfair that Walker, an eleven-year veteran of WHA, forfeit his job because of one impulsive step; it may have thought that McCarthy was uncharitable and opportunistic. But it is impossible to understand how a rational jury could infer malice by a preponderance of the evidence when there is no evidence of malice at all.

█ Of course, the jury may simply have disbelieved McCarthy's statement of his reasons; factfinders have a great deal of latitude in appraising witnesses, cf. *D'Orsay Equip. Co. v. United States Rubber Co.*, 302 F.2d 777, 779–80 (1st Cir.1962), although one might think that there are some limits where the story is plausible, consistent and wholly uncontradicted. Cf. *Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.*, 772 F.2d 505, 514 n. 8 (9th Cir.1985). But even if McCarthy were not credited in one particular or another, Walker's burden goes beyond merely setting McCarthy's testimony aside: the burden was upon Walker to show affirmatively that McCarthy acted out of malice.

Most of the authorities say that one side cannot carry its affirmative burden of proof

---

1. When an employer or supervisor is acting within the scope of his employment responsibilities, the hiring and firing decisions are privileged unless he acted with malevolence. *Gram v. Liberty Mutual Ins. Co.*, 384 Mass. 659, 429 N.E.2d

21, 24 (1981). When a third-party contract is involved, liability is tested differently. *Compare King v. Driscoll*, 418 Mass. 576, 638 N.E.2d 488, 494–95 (1994) *with Draghetti v. Chmielewski*, 416 Mass. 808, 626 N.E.2d 862, 870 n. 14 (1994).

on a fact by pointing to the possibility that the jury disbelieved the other side's denial of the fact. *United States v. Zeigler,* 994 F.2d 845, 848–50 (D.C.Cir.1993); *Janigan v. Taylor,* 344 F.2d 781, 784–85 (1st Cir.), *cert. denied,* 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965); *Dyer v. MacDougall,* 201 F.2d 265, 268–69 (2d Cir.1952) (Hand, J.). But others have disagreed, *see United States v. Zafiro,* 945 F.2d 881, 888 (7th Cir.1991), *aff'd on other grounds,* — U.S. —, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), and the strength of such an inference could vary greatly depending on context, including other evidence and the logical force of the inference. Here, there is no "other evidence" of malice and malice is not the only logical alternative to believing in full McCarthy's account of his own motives in postponing the meeting.

The Supreme Judicial Court of Massachusetts has stressed that in tortious interference cases involving employment and discharge, malice means "actual malice" and "[a]ny reasonable inference of malice must ... be based on probabilities rather than possibilities." *Gram,* 429 N.E.2d at 24–25. The court continued: "An inference of the probability of malice, action motivated by spite, does not reasonably follow from a showing, in these circumstances, only of negligence or of sloppy and unfair business practices." *Id.* at 25. This is virtually an epitaph on Walker's claim.

The remaining claims and arguments by both sides are mooted by our decision. The appellants' numerous other attacks on Walker's monetary judgment need not be considered. Likewise, Walker's claim that attorney's fees and costs should have been granted him under Rule 54(d) and 42 U.S.C. § 1988 fails since he has obtained no relief at all. The judgment in favor of WHA and McCarthy on all claims other than count IV is *affirmed;* the judgment in favor of Walker and against McCarthy on count IV is *reversed.* No costs in this court are awarded to either side.

*It is so ordered.*